AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| | ) |
| The person Vin GAINES SR | ) |
| | ) |
| | ) |

**FILED**

Oct 21, 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

Case No.     2:20-sw-0986 JDP

# SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**The person Vin GAINES SR**

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371 and 922(a)(1)(A); | Conspiracy to deal firearms without a license; |
| 18 U.S.C. § 922(a)(1)(A); | Dealing Firearms without a License; |
| 26 U.S.C. § 5861(d); | Possession of Unregistered Firearms; |
| 26 U.S.C. § 5861(e); | Transfer of Firearms in Violation of National Firearm Act; |
| 18 U.S.C. § 922(g); | Felon in Possession of a Firearm; |
| 21 U.S.C. §§ 841(a)(1) and 846; and | Conspiracy to distribute and possess with intent to distribute methamphetamine; |
| 21 U.S.C. § 841(a)(1) | Distribution and possession with intent to distribute methamphetamine. |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☒ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____ /s/ Louis Russo _____
*Applicant's signature*

Special Agent Louis Russo
Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed telephonically.

Date: _October 21, 2020_

_____ *Jeremy Peterson* _____
UNITED STATES MAGISTRATE JUDGE

City and state:  Sacramento, California

Jeremy D. Peterson , U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS AND A CRIMINAL COMPLAINT

I, Louis Russo, Special Agent with Homeland Security Investigations ("HSI"), being duly sworn, depose and state as follows:

### Background and Expertise

1.     I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE")/Homeland Security Investigations ("HSI"), presently assigned to the Office of the Assistant Special Agent in Charge, Sacramento, California (HSI/Sacramento).  I was employed by HSI from November 2010 through July 2011, and was hired again by HSI in November 2019.  In the interim, I attended law school, and worked as an attorney and in armed security.

2.     As a Special Agent I am authorized to investigate crimes and execute arrests. At the Federal Law Enforcement Training Center in Glynco, Georgia, I completed the Criminal Investigator Training Program, and the ICE Special Agent Training Program. While in attendance, I received specialized training in narcotic investigation matters including, but not limited to: drug interdiction, drug detection, money laundering techniques and schemes, drug identification, and asset identification.

3.     Prior to joining HSI, I was also employed as a Border Patrol Agent assigned to Rio Grande City, Texas.  I received training in narcotics detection and interdiction while attending the Border Patrol Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico.

4.     Prior to working in law enforcement, I received a Master of Science Degree in Criminal Justice from Buffalo State College, a Dual Major Bachelor of Arts degree from the University at Buffalo, and a Juris Doctor degree from St. Thomas University School of Law.  I am also a member of The Florida Bar in good standing.

### Scope of Requested Search Warrants

5.     This affidavit supports an application for warrants to search the location and vehicle further described below and in **Attachments A-1 and A-2**.  The contraband, objects, and information for which we will search are described in **Attachment B**.  Attachments A-1 and A-2 and Attachment B are incorporated by reference.

6.     This Affidavit is submitted in support of warrants to search the following location, vehicle, and person, for the items described in **Attachment B**:

      a.     The residence located at **2444 Montclair Street, Stockton, California** (the "**Target Residence**"), as described in Attachment A-1;

b.      A 2015 silver Nissan Altima, with California license plate 7PLA458 (the "**Target Vehicle**"), as described in Attachment A-2; and

c.      Vin GAINES SR.

## Scope of Requested Criminal Complaint

7.      This affidavit also supports an application for a criminal complaint and arrest warrants for:

a.      Johnnie ROSS JR.
(Counts 1-2)

b.      Vin GAINES JR.
(Counts 3-6)

COUNT ONE –      Dealing Firearms without a License, in violation of 18 U.S.C. § 922(a)(1)(A) (October 10, 2019 – January 27, 2020).

COUNT TWO –      Possession of an Unregistered Machinegun, in violation of 26 U.S.C. § 5861(d) (October 10, 2019).

COUNT THREE –      Dealing Firearms without a License, in violation of 18 U.S.C. § 922(a)(1)(A) (January 13, 2020 – February 20, 2020).

COUNT FOUR –      Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1) (January 13, 2020).

COUNT FIVE –      Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1) (February 20, 2020).

COUNT SIX –      Distribution of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (February 20, 2020).

8.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

/ / /

/ / /

/ / /

/ / /

## Statement of Probable Cause

### Background of Investigation

9.      The United States Government, including HSI and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), has been investigating members and associates of the Everybody Killa ("EBK") criminal street gang in Stockton, California since approximately September 2019.

10.     A San Joaquin County Sheriff Office Confidential Source ("CS-1") provided information regarding the EBK street gang and its illicit activities. It should be noted that CS-1 is currently working with law enforcement for monetary compensation. CS-1 previously worked with law enforcement in this case as part of a cooperation agreement to reduce pending felony charges to a misdemeanor firearms conviction; after fulfilling the terms of that cooperation agreement, CS-1 agreed to continue working for monetary compensation. CS-1 has no felony convictions. Agents have been able to corroborate much of the information provided by CS-1 through surveillance and recorded communications. I am not aware of CS-1 providing false or misleading information during this investigation. For these reasons, I believe the information provided by CS-1 to be reliable.

11.     According to CS-1, the EBK street gang is primarily funded through its illegal sales of firearms. The firearms are purchased out of state and transported to San Joaquin County, California, to be sold. The firearms include fully automatic firearms.

12.     CS-1 described one of EBK's methods of obtaining the firearms for sale.  According to CS-1, EBK member Johnnie ROSS JR. would drive out of state to Reno, Nevada, where he would find people to purchase firearms on his behalf for drugs or money.  ROSS JR. would then transport the firearms back to San Joaquin County where he, along with other EBK members, would search for buyers.

### Controlled Purchase of Two Glock Handguns – Including a Fully Automatic Handgun – from ROSS JR. on October 10, 2019

13.     On October 9, 2019, at agents' direction, CS-1 arranged for CS-1 and an undercover agent (the "UC") to purchase two firearms from ROSS JR.  ROSS JR. told CS-1 that one of the firearms was "fully automatic."

14.     On October 10, 2019, the UC and CS-1 conducted a controlled purchase[1] from ROSS JR. at a residence in Stockton, CA.  ROSS JR. sold the UC a Glock 23GEN4, .40 caliber pistol, with serial number BBUV364, for $1,300.

---

[1] Unless otherwise stated, immediately before each controlled purchase described in this affidavit, investigators met the confidential source(s) ("CS") at a predetermined location and searched each CS's person and vehicle to confirm there was no unauthorized contraband or money present, each time with negative results.  Investigators equipped the Undercover Agent

15.     The UC then asked ROSS JR about the "fully automatic" firearm he had for sale.  ROSS JR. left the residence and returned with a Glock 19, 9mm caliber machine gun, with serial number BAZK124, which he sold to the UC for $2,000.  ROSS JR. explained to the UC how the switch worked on the firearm to make it a functioning machine gun.  ROSS JR stated that he had another Glock auto switch which would convert a firearm to a machine gun and agreed to sell it to the UC.  ROSS JR. attempted to locate the Glock auto switch at his cousin's residence but was unsuccessful.

16.     On October 12, 2019, CS-1 informed agents that ROSS JR. went to Reno to purchase firearms to resell in California.  The next day, on October 13, 2019, CS-1 informed agents that ROSS JR. went to CS-1's residence.  ROSS JR. showed CS-1 a Glock 27 that he had purchased in Reno and told CS-1 that he had it for sale for $1,000. ROSS JR. told CS-1 that he would be returning to Reno to purchase more firearms, including a micro-Draco.

17.     On October 15, 2019, investigators test fired the Glock 19, 9mm machine gun (s/n BAZK124) and determined that it fired more than one round with a single trigger pull.

18.     A query of the National Firearm Registration and Transfer Record ("NFRTR") on or about February 5, 2020, revealed that ROSS JR. did not have any firearms licensed to him in the NFRTR.

**Controlled Purchase of a Handgun from ROSS JR. on October 28, 2019**

19.     On October 27, 2019, ROSS JR. contacted CS-1 and told CS-1 that he had a "Micro Draco" style firearm for sale that he had acquired from a trip to Reno, Nevada.  ROSS JR. agreed to sell the firearm to CS-1 for $1,500.

20.     On October 28, 2019, CS-1 went to the residence in Stockton where ROSS JR. had agreed to meet CS-1 for the firearm deal.  CS-1 called ROSS JR. after arriving at the residence.  ROSS JR. said he was on his way and asked if CS-1 wanted the "AR" pistol, which he offered for $1,300.  A few minutes later, ROSS JR. arrived and showed CS-1 the AR pistol and said he did not have the Micro Draco.  CS-1 said s/he wanted the Micro Draco and ROSS JR. said he could sell it for $1,700.

21.     ROSS JR. then sold the AR-style pistol to CS-1 for $1,300.  The firearm was a DLN Model DTI-15 5.56 caliber pistol, with serial number DTI-S199280.

---

("UC") and CS with audio and/or video recording equipment for each controlled purchase. The UC and/or the CS were provided with pre-recorded funds to purchase firearms.  Surveillance agents monitored all controlled purchases from nearby locations.  Surveillance agents monitored audio and/or video transmissions and the location of the UC and/or CS.  Upon the completion of the controlled purchase, the UC and/or CS met with investigators to transfer the firearms into ATF custody and debrief the CS.  The CS was searched upon the completion of the controlled purchase for contraband and money, with negative results each time.

### Controlled Purchase of Two Handguns from ROSS JR. on October 29, 2019

22.   The next day, on October 29, 2019, CS-1 and the UC again met with ROSS JR. at the same residence in Stockton as the previous two controlled purchases.  ROSS JR. sold the UC a Glock 21, .45 caliber pistol, with serial number XZN191, for $900.

23.   ROSS JR. said that the mini Draco was his brother's and that he had an "XD."  The UC and ROSS JR. negotiated a price of $800 for the XD.  ROSS JR. agreed to get the XD and said he would be back in 5-10 minutes.  About 5 minutes later, ROSS JR. returned and then said it would take him 5 minutes because he had to go to his cousin Marty's house on Eighth Street to get the firearm.  About 15 minutes later, ROSS JR. returned with the gun, which he sold to the UC for $800.  The gun was an HS Product XD40 Sub-Compact, .40 caliber pistol, with serial number XD331272.

24.   The UC and ROSS JR. then discussed future firearms purchases.  ROSS JR. stated that he could only get two chops and two handguns at a time in Reno by the next Tuesday.

### Controlled Purchase of Two Firearms from ROSS JR. on October 30, 2019

25.   On October 29, 2019, while in the presence of the UC, CS-1 received an Instagram video call from ROSS JR.  ROSS JR. showed the UC that he had a Micro Draco for sale that he had mentioned earlier in the day (during the controlled purchase described above).  The UC negotiated a price of $3,000 for both the Micro Draco and a full size AK rifle that ROSS JR. said he had for sale.

26.   The next day, on October 30, 2019, ROSS JR. arrived at CS-1's residence without notice and dropped off the two firearms for the UC.  Later, the UC picked up the firearms and gave CS-1 $3,000, which CS-1 paid to ROSS JR. when ROSS JR. returned for the money.  The firearms were a Romarm/Cugir Micro Draco, 7.62 caliber pistol, with serial number PMD-13547-19, and an IO Inc. Sporter, 7.62 caliber rifle, with serial number 027290.

### Controlled Purchase of a Rifle from Vin GAINES JR. on January 13, 2020

27.   On January 13, 2020, Vin GAINES SR., the father of GAINES JR., spoke with CS-1 in a recorded phone call.  GAINES SR. told CS-1 that he was going to give CS-1's phone number to his son, GAINES JR., because GAINES JR had something to sell to CS-1.  GAINES JR. subsequently called CS-1 and told CS-1 that he had an AR-15 for sale for $2,000.  CS-1 agreed to the price and arranged for an ATF Confidential Source ("CS-2") to purchase the firearm later that day.

28.   It should be noted that CS-2 is currently working with law enforcement for monetary compensation. CS-2 has a criminal history that includes previous felony and misdemeanor convictions for crimes related to drugs, resisting an officer, and firearms. Agents have been able to independently corroborate much of the information provided by CS-2 in this investigation through audio recordings and physical surveillance. I am not

aware of CS-2 providing false or misleading information during this investigation. For these reasons, I believe CS-2 to be reliable.

29.     Later on January 13, 2020, CS-1 and CS-2 drove together to the agreed-upon meet location, 2444 Montclair St, Stockton, California (the **Target Residence**).  After CS-1 and CS-2 arrived in front of the **Target Residence** in their vehicle, GAINES JR. exited the front door of the **Target Residence** carrying a black rifle bag.  GAINES JR. then sold CS-1 and CS-2 a Smith & Wesson M&P 5.56 caliber rifle, with serial number TK33556, for $2,000.  (CS-2 mistakenly paid $2,100; GAINES JR. acknowledged in a subsequent phone call that he had an extra $100 and said he would make it right next time.)  When CS-1 asked about the other firearm ROSS JR. had for sale, GAINES JR. stated they would have to come back later, since it was locked up.  A records search for the Smith & Wesson M&P 5.56 caliber rifle, s/n TK33556, revealed that the firearm was reported stolen in Reno, Nevada on April 23, 2019.

30.     A check of GAINES JR.'s criminal history reveals the following felony convictions punishable by more than one year in prison:

   a.     Possession of a narcotic controlled substance, in violation of California Health and Safety Code § 11350(a), on or about April 2, 2008, in San Joaquin County; and

   b.      Vehicle theft, in violation of California Vehicle Code § 10851(a), on or about September 15, 2009, in San Joaquin County, for which GAINES JR. was sentenced to 32 months in prison.

31.     An ATF interstate nexus expert has determined that the firearm that GAINES JR. sold, a Smith & Wesson M&P 5.56 caliber rifle, with serial number TK33556, was manufactured outside California, and, therefore, moved in interstate commerce.

### Controlled Purchase of Two Glock Handguns from ROSS JR. on January 13, 2020

32.     Later on January 13, 2020, CS-1 and CS-2 met ROSS JR. at his residence (2419 Montclair Street, Stockton).  ROSS JR. sold CS-1 and CS-2 a Glock 31, .357 caliber pistol, with serial number ULM545, for $1,200.  CS-1 and ROSS JR. then discussed possibly traveling to Reno to get firearms.

33.     After CS-1 and CS-2 left, ROSS JR. called CS-1 and said he had another Glock for sale.  CS-1 and CS-2 then returned to ROSS JR's residence and purchased a Glock 19, 9mm caliber pistol, with serial number BR190US, for $1,200.  ROSS JR. told CS-1 that he was going to leave for Reno that night to purchase more firearms.  ROSS JR. told CS-1 that Vin GAINES SR. was going to drive him there in a white Chevy Equinox and that GAINES SR. is the one who commonly drives him to Reno to purchase firearms to transport back to California.

/ / /

34.  The next day, on January 14, 2020, GAINES JR. contacted CS-1 in the street and stated that he may have more firearms available for sale and that he had recently just returned from Reno.

35.  On January 16, 2020, at approximately 6:30 am, court-authorized GPS location ping data for the cellular phone used by GAINES SR. showed it traveling to Reno, Nevada.  During the course of the day, the GPS location showed the cellular phone traveling to Reno, attempting to return to California, returning back to Reno, and eventually going back to California and remaining in Stockton, California.  When GPS showed the cellular phone in the area of Sacramento, California, CS-1 made a cellular phone call to the cellular phone used by GAINES SR.  GAINES SR. told CS-1 that he was in Sacramento and was returning to Stockton later.  Later that day, surveillance units observed the GAINES SR.'s white Chevy Equinox (CA license plate 8KCR028) parked in Stockton, California.

36.  On January 22, ROSS JR. and GAINES SR. were observed by surveillance driving from Stockton, California to Reno, Nevada, in the same white Chevy Equinox.  Upon the Equinox returning to California, California Highway Patrol conducted a traffic stop for a vehicle violation and identified ROSS JR. and GAINES SR. as the occupants of the vehicle.  ROSS JR. was arrested for an outstanding warrant in San Joaquin County.  ROSS JR. posted bail on January 23, 2020, and GPS location from a court-authorized tracker showed the white Equinox traveling up to Auburn to pick up ROSS JR. and return back to Stockton, CA.

### ROSS JR. Gives CS-1 a Glock Handgun to Sell on January 27, 2020

37.  On the morning of January 27, 2020, CS-1 contacted agents and said that ROSS JR. had arrived unannounced at CS-1's residence, given CS-1 a Glock firearm, and asked CS-1 to sell it for him.  Shortly thereafter, agents arrived and took the firearm into ATF custody.  The firearm was a Glock 22, .40 caliber pistol, with serial number NCZ698.

38.  Later that day, ROSS JR. was arrested on a state criminal charge and he has remained in custody on that charge since then.

### Controlled Purchase of a Rifle and Methamphetamine from Vin GAINES JR. on February 20, 2020

39.  On February 19, 2020, CS-2 contacted GAINES JR. and arranged to purchase a firearm the next day.

40.  O n February 20, 2020, GAINES JR. instructed CS-2 to meet him at the same location as the previous deal.  CS-2 then drove to and met GAINES JR. in front of the **Target Residence**.  GAINES JR. got into CS-2's vehicle and sold CS-2 a Del Ton Inc. Model DTI, 5.56 caliber rifle, with serial number DTI-S199269, for $1,500.

41.  CS-2 then asked if GAINES JR. had any methamphetamine for sale and how much an ounce cost.  GAINES JR. said he sells an ounce for $200 and could get it right down the

street.  GAINES JR. then walked down the street where he talked with an unknown male in front of 2407 Montclair Street.  GAINES JR. returned and got back into CS-2's vehicle and sold CS-2 about an ounce of methamphetamine for $200.  They then discussed CS-2 buying more firearms from GAINES JR.

42.     The suspected methamphetamine weighed approximately 26.1 grams and tested presumptive positive for methamphetamine based on a field test.

43.     An Etrace of the firearm showed that it was purchased on January 27, 2020 in Reno, Nevada, and thus traveled in interstate commerce to Stockton, California.

### Additional Information Regarding the Target Residence

44.     On July 30, 2020, GAINES JR.'s Instagram account ("mrnolackin2100") posted the following photographs:



45.     The first photograph showed GAINES JR standing in front of the **Target Residence**, displaying his fingers for the gang sign of EBK.  The second photograph shows GAINES JR standing in front of the **Target Residence**, with his brother, Dante Gaines.

46.     Dante Gaines (son of GAINES SR. and brother of GAINES JR.) and Parrish Kendricks were arrested in Medford, Oregon on November 16, 2019 by Medford Area Drug Gang Enforcement (MADGE) for distribution and sales of methamphetamine, cocaine and heroin.  The arrests followed the execution of search warrants at the Traveler's Inn, 954 Alba Drive, Medford, Oregon, Rooms 220 and 221.  During the search of the hotel rooms, officers seized approximately 188 grams of methamphetamine, 75 grams of black tar heroin, 9.87 grams of cocaine, and $4,494 in cash.  Dante Gaines was in possession of the keys to the white Chevy Equinox (CA license plate 8KCR028), which was released to the registered owner, GAINES SR.  Dante Gaines and Kendricks are both documented EBK gang members.  Dante Gaines and Kendricks gave their home residence as the **Target Residence**.  Dante Gaines and Kendricks pled guilty in Oregon State Court for narcotics sales.  Kendricks is currently serving time in Oregon State Prison.  Dante Gaines is currently out of custody on Oregon State Probation.

47.     On October 16, 2020, a query of a law enforcement database for the **Target Residence** shows GAINES JR. as a subject at the **Target Residence**.  GAINES SR., Dante Gaines and Kendricks are also listed as subjects at the **Target Residence**.

48.     On October 18, 2020, Investigators showed CS-1 the Instagram postings by GAINES JR., dated July 30, 2020.  CS-1 confirmed that the residence GAINES JR. was standing in front of was the **Target Residence**, which GAINES JR. exited and entered on January 13, 2020 when he sold the firearm to CS-1 and CS-2.  CS-1 further stated that EBK gang members would talk about the **Target Residence** as a "trap house" where EBK gang members would store firearms and narcotics to hide from law enforcement.

49.     On October 20, 2020, a deputy with the San Joaquin County Sheriff's Office observed GAINES JR. in the driveway of the **Target Residence**.

### Additional Information Regarding the Target Vehicle

50.     On September 14, 2020, CS-2 attempted to purchase methamphetamine from GAINES JR.  CS-2 arrived at the Mariposa Market to try to make contact with GAINES JR.  CS-2 observed GAINES SR. at the Market and asked if GAINES JR. was around.  GAINES SR. placed a cellular phone call to GAINES JR. in the presence of CS-2.  GAINES SR. handed the cellular phone to CS-2, who arranged to purchase one ounce of methamphetamine from GAINES JR.  CS-2 handed the cellular phone back to GAINES SR.

51.     CS-2 waited in a vehicle and placed several phone calls to GAINES JR. to find out his location.  Surveillance observed GAINES JR. driving a silver Nissan Altima, with California license plate 7PLA458 (the **Target Vehicle**), and an unknown male in the front passenger seat, into the Market parking lot.  The unknown male exited the vehicle

and walked over to CS-2's vehicle. The unknown male attempted to sell CS-2 marijuana. CS-2 stated that the purchase was for methamphetamine. The unknown male stated he would let GAINES JR. know and walked back to GAINES JR., who was in in the **Target Vehicle**. The unknown male entered the **Target Vehicle**, which left the parking lot.

52. A query of the **Target Vehicle** showed it is currently registered to Fabian Cortez at 4366 Texas St, Apt G, San Diego, CA 92104. Based on my training and experience, I know that individuals engaged in unlawful dealing of firearms without a license and sales of narcotics commonly use vehicles registered in the names of others.

### Federal Firearms License Check

53. A Federal Firearms License check was conducted on October 7, 2020 to confirm that ROSS JR. and GAINES JR. do not have, and never had a Federal Firearms License to deal firearms.

### Training and Experience Regarding Firearms Trafficking and Firearms Traffickers

54. Based on my training and experience, my participation in other investigations involving firearms and narcotics trafficking, and my conversations with other experienced law enforcement officers, I know that firearms traffickers frequently possess the following items at residences, stash locations, and business premises (including rooms, attics, basements, and other parts therein, the surrounding grounds, any garages, storage rooms, safes, gun safes, locked cabinets, storage lockers, trash containers, and any outbuildings located thereon, vehicles parked on the property or in the driveway that are registered to the suspects, garage, or assigned parking area(s), at such locations, which are owned, controlled or used by firearms traffickers):

55. Individuals involved in the trafficking of firearms commonly possess firearm parts and tools to include firearms, lower receivers, upper receivers, grips, stocks, magazines, magazine repair kits, trigger assemblies, unfinished lower receivers, and barrels; tools and equipment associated with the manufacture of firearms, including CNC machines, drills, drill presses, lathes, welding equipment, jigs, hack saws, power saws, etc.; and templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

56. Individuals involved in the trafficking of firearms commonly maintain information concerning where and from whom the trafficker purchased and/or sold firearms or firearm parts; firearm records (purchase/sale, method of payment), documents related to milling of the firearms, notes or other documentation concerning profits made to include customer files and services; records and/or documents provided to customers in connection with the service provided; correspondence to and/or from actual or prospective customers or suppliers; records and/or documents reflecting or related to the purchase of equipment, materials, or supplies for the operation of the business; and records and/or documents of mailings, shipping or delivery, whether by the United States Postal Service or other private delivery services.

57.    Individuals involved in the trafficking of firearms often possess information concerning methods used to advertise the availability of their firearms or firearm parts for purchase; photos of their firearms or firearm parts for purposes of advertising for sale, to keep track of their inventor, for insurance in case of theft, etc.; written, recorded oral, or digital communications with associates involved in the purchase/sale of firearms or firearm parts; and written statements showing profits made from the sale of firearms or firearm parts for internal purposes.

58.    Individuals involved in the trafficking of firearms usually keep bank deposits records, checking account records, and other financial documentation showing the purchase of firearms or firearm parts, the securing of cash to purchase firearms, and the depositing of cash proceeds from the sale of firearms.; other records and/or documents which appear to be related to the business including, but not limited to notes, internal correspondence, external correspondence, memoranda, and directives; cell phone records which show the phone number and subscriber information, and numbers called/received; and indicia of persons in control over a premises where the above items are found, including addressed mail, material in the premises with personal identification information, photographs of persons in or about the location, etc.

59.    Individuals involved in firearms trafficking frequently take, or cause to be taken, photographs of themselves, their associates, their property, and their product (firearms). These items are kept in secure locations within their cellular telephones, residences, offices, garages, automobiles, storage lockers, and safe deposit boxes, for ready access to and to conceal such items from law enforcement authorities.

60.    Individuals involved in firearms trafficking often maintain articles of personal property, such as personal identification, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, rent receipts, addressed envelopes, bills, personal telephone and address books, unexposed film, video tapes, and video cassette boxes.  These items are essential to establish the identities of individuals in control or possession of the premises, residences, vehicles, storage area, and containers being searched.  These items are kept in secure locations within their cellular telephones, residences, offices, garages, automobiles, storage lockers, and safe deposit boxes, for ready access and to conceal such items from law enforcement authorities.

61.    Individuals involved in firearms trafficking will often use cellular telephone and/or pagers to further their criminal activity, and maintain telephone bills which reflect their calls which facilitate drug trafficking.  By reviewing information contained on telephones, answering telephones, returning calls, texts, or emails, co-conspirators have been and can be identified and additional firearms have been or can be seized.

62.    Individuals involved in illicit activities that generate large amounts of income will conduct cash purchases, the purchasing of numerous monetary instruments with cash in amounts less than $10,000 to avoid reporting requirements, the use of aliases and nominees, the use of businesses as "fronts" in an attempt to legitimize and conceal activities, the use of wire remitter companies to convert into wire transfers below

reporting requirements and the use of "off-shore" banking in an attempt to break the paper trail. These and other schemes are commonly referred to as "money laundering."

63.     Individuals involved in illicit activities normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, and other financial documents, in their personal residences and place of business. Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons and often use accountants to complete financial statements and tax returns for their business and personal tax returns.

64.     Individuals involved in illicit activities maintain evidence of their crimes for long periods of time. The evidence may be necessary business records that must be kept for information reporting purposes, such as for state and Federal tax returns, and loan applications. The evidence may also be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The criminal offender may also be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer-related evidence that may be retrievable by a trained forensic computer expert.

65.     Individuals who amass proceeds from both legal and illegal activities routinely attempt to further that conduct, and/or in the case of illegal activities conceal the existence and source of their funds, by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, money orders, etc. Records of such instruments are routinely maintained at the individual's residence or place of business.

66.     The net worth/source and application of funds analysis show that a person's known expenditures and/or accumulation of assets substantially exceed their legitimate source of income to prove that the suspect is engaged in either legal or illegal money generating activities, such as real estate investing or narcotics trafficking. The net worth analysis compares a suspect's net worth (cost value of total assets minus total liabilities) at a time just before the suspect has commenced his/her purported criminal enterprise, to his/her net worth at the approximate time of his/her cessation of criminal activity.

67.     The source and application of the funds analysis focuses on the suspect's expenditures during the time period of the purported illegal activities and compares such expenditures with his/her legitimate source of income. Both analyses require evaluation of bank records, credit records, loan records, documents evidencing ownership of assets, and other documents evidencing the financial profile of the suspect during the course of the

purported illegal activity, as well as a short time period prior to the illegal activity (e.g., one year).  Other than assisting in the net worth/source and application of funds analysis, a financial profile of a suspect prior to the purported criminal activity that are consistent with a person generating income from illegal activities (e.g., drug or firearms trafficking), as compared to a person earning income from legitimate sources.  Evidence of a defendant's expenditures, asset accumulation, financial life-style, net worth/source and application of funds analyses, and underlying financial documents necessary for such analysis are admissible evidence under federal case law.  Thus, there is a bona fide reason for the need for such documents to be taken during the execution of a search warrant.

68.     Individuals involved in drug and firearms trafficking often maintain, on hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business.  These individuals conceal caches of drugs and firearms, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug and firearms transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in drug and firearm trafficking activities, in their residences, offices, garages, automobiles, storage buildings, and safety deposit boxes.

### Training and Experience Regarding Drug Trafficking and Drug Traffickers

69.     As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions.  Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators. These records may be kept on paper or contained in memory calculators or computers.  It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control.  It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live.  United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986).  It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time.  United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991).

70.     Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them.  Typically, drug traffickers keep records of those registrations and transactions in their residence.

71.     I have learned that large-scale drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business.  It has

been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

72.     In my experience, traffickers commonly have in their possession, that is, on their person, at their residence and in the areas under their control, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Such firearms are used by drug violators to protect their illicit drug trafficking operations, and themselves against law enforcement and other drug violators because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds. Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers and quantities of currency.

73.     In my experience, traffickers commonly have in their possession, that is on their person, at their residences, and their vehicles, and in the areas under their control and which they have free and ready access to, drugs, including but not limited to in this case, methamphetamine and marijuana, which they intend to distribute. It is my experience that drug traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

74.     In my experience, drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

75.     In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

76.     In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities. It has also been my experience that traffickers will also utilize vehicles as locations in which to store controlled substances prior to distribution. During prior investigations, I have observed that drug traffickers will often utilize vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

77.     In addition, these traffickers tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" the proceeds derived from the distribution of controlled substances.

78.  In establishing these entities, the traffickers sometimes must travel to meetings in foreign countries as well as domestically. As a result of that travel, records are generated reflecting travel by commercial and private aircraft, Commercial Ocean and private vessels as well as common carrier(s).

79.  Individuals involved in the distribution of  cocaine, crack cocaine, methamphetamine, heroin, and counterfeit opioid pills often make, or cause to be made, pictures, videos, movies, compact discs, floppy discs, or other such items which are or contain photographic or digital images in order to memorialize their narcotics distribution, use, possession, or any other activities surrounding their methamphetamine and other drug trafficking activities, and that such items often identify co-conspirators in their drug trafficking activities.

80.  It has been my experience in the past, and particularly in this case, that when suspects utilize mobile telephones to communicate with cooperating individuals or undercover agents to set up drug deals, records relating to these activities will be found stored in the cellular telephone.

81.  I know that narcotics traffickers use mobile telephones to communicate with one another, either by voice or text message.  Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones.  Mobile telephones also contain in their memory a telephone book.  This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business.  Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user.  The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate.  Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity.  Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime.  Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

82.  As described above and in Attachment B, this Affidavit seeks permission to search and seize things that are related to the methamphetamine trafficking conspiracy between GAINES JR. and his co-conspirators and associates, in whatever form such things are

stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

83. It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in Attachment B are items most often associated with the distribution of controlled substances, including methamphetamine, as well as the proceeds from such illegal operations.

84. The facts set forth in this Affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents who have participated in this investigation, and from reviewing official reports, documents, and other evidence obtained as a result of this investigation. This Affidavit is not an exhaustive enumeration of the facts that I have learned during the course of this investigation but, instead, are facts that I believe support a finding of probable cause to search the requested locations.

85. Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in Attachment B. Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances. Therefore, I am requesting authority to seize all the items listed in Attachment B to this Affidavit and incorporated here by reference.

86. **REQUEST FOR SEALING:** I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

**[CONTINUED ON NEXT PAGE]**

## Conclusion

87.   The facts in this Affidavit demonstrate probable cause to believe that Johnnie ROSS JR., Vin GAINES JR., Vin GAINES SR., and other co-conspirators and associates are involved in the above-described offenses, and that evidence, fruits, and instrumentalities of these offenses, as described in Attachment B, are likely to be found at the location and in the vehicle listed in Attachments A-1 and A-2, and on the person of GAINES SR..

I swear under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information and belief.

_____/s/ Louis Russo_____
Louis Russo
Special Agent
Homeland Security Investigations

Sworn to and subscribed to me telephonically on October __21___, 2020.




_____
UNITED STATES MAGISTRATE JUDGE

Approved as to form:


_/s/ David Spencer_____
David W. Spencer
Assistant United States Attorney

17

# Attachment B
## Items to be Seized

Law enforcement is authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"):

- 18 U.S.C. §§ 371 and 922(a)(1)(A) – Conspiracy to deal firearms without a license;

- 18 U.S.C. § 922(a)(1)(A) – Dealing Firearms without a License;

- 26 U.S.C. § 5861(d) – Possession of Unregistered Firearms;

- 26 U.S.C. § 5861(e) – Transfer of Firearms in Violation of National Firearm Act;

- 18 U.S.C. § 922(g) – Felon in Possession of a Firearm;

- 21 U.S.C. §§ 841(a)(1) and 846 – Conspiracy to distribute and possess with intent to distribute methamphetamine; and

- 21 U.S.C. § 841(a)(1) – Distribution and possession with intent to distribute methamphetamine.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1.    Controlled substances, including methamphetamine, or items used to distribute controlled substances; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

2.    United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase heroin and counterfeit oxycodone pills during this investigation;

3.    Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4.    Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1);

5.      Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

6.      Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7.      Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including traveler's checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.      Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9.      Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.     Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person;

11.     Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records;

12.     Any firearm that does not have a lawful manufacturer stamp and serial number, any unregistered firearm (where registration is required by Title 26 of the United States Code), and unfinished lower receivers of any kind (including AR style unfinished lower receivers);

13.     Any items pertaining to the possession, manufacture, or distribution of illegal firearms, including but not limited to, lower receivers, upper receivers, grips, stocks, magazines, trigger assemblies, and barrels (including for AR-style firearms);

14.     Any tools and/or equipment associated with the manufacture of firearms, including but not limited to drills, drill presses, lathes, molds, molding equipment, welding equipment, jigs, hack saws, power saws, templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms;

15.     Photographs developed and undeveloped and/or videotapes or DVDs/CDs of firearms, firearm transactions, firearm parts, large sums of money and/or co-conspirators and

paperwork showing the purchase, storage, disposition, or dominion and control over any firearms, firearm parts, ammunition, or any of the items described in Attachment B;

16. Records relating to the acquisition and distribution and repair of firearms, firearms parts, tools and/or equipment associated with the manufacture of machineguns, short barreled rifles and/or other firearms, including but not limited to ATF Forms 4473, California Dealer Of Record Sale (DROS) records, books, receipts, invoices, notes, ledgers, and pay/owe sheets.  The records should also include, but not be limited to, bank records, vendor lists, mailings, and purchase invoices/receipts;

17. Personal telephone books, telephone records, telephone bills, address books, correspondence, notes, and papers containing names and/or telephone numbers that tends to establish communication between co-conspirators;

18. Digital evidence of items described in Attachment B;

19. Evidence and records relating to the accumulation of proceeds derived from illegal firearms trafficking and manufacturing including, but not limited to, money order receipts, money transfer documents, bank records, and sales invoices/receipts;

20. Rental or lease agreements for storage units, safety deposit boxes, other storage locations, keys, combinations, and/or access codes for them;

21. Indicia of occupancy, residency, and/or ownership of the items noted above and of the premises, including but not limited to, papers, correspondence, canceled envelopes, canceled postcards, bills, and registration documents;

22. Any safes, locked cabinets, and/or other secured containers and/or devices at the location and in/on the vehicle identified in Attachments A-1 and A-2.  Law enforcement shall be permitted to open such locked containers by force or through the use of a locksmith if necessary;

23.  Any machines and/or parts/tools associated with the use and/or association of the manufacturing and/or modifying of firearms, firearm parts, AR style unfinished lower receivers (and firearm unfinished lower receivers of any kind) machineguns and/or machinegun parts including but not limited to templates, cutting programs, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms;

24. Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to deal and/or manufacture firearms without a license, in violation of 18 U.S.C. §§ 371 and 922(a)(1)(A);

25. The contents of any surveillance camera or surveillance system used at the location identified in Attachment A-1;

26. United States and/or foreign currency in excess of $2,000.00. Items in excess of $2,000.00 in value tending to establish the expenditure of substantial income from illegal weapons trafficking, to include money orders, cashier's checks, certified checks, gold, silver, jewels, negotiable securities, certificates of deposit, documents depicting expenditures of cash;

27. Items evidencing the receipt of income from any source including Forms W-2, and 1099, Federal and State income tax records and work papers, employment records, pay stubs, social security statements, business receipts, business books and records, journal and ledgers reflecting receipts, receipts, invoices, records from sales of assets, real estate sale and purchase records, escrow records, bank records (including foreign accounts and related transactions), brokerage records, investment account statements, receipts documenting purchase and sale of stocks, contracts, purchase orders, estate records, loan records, letters of credit, notes receivable, IOU's and other recordation of debts comprising evidence of loans receivable, documents reflecting insurance settlements, documents reflecting receipt of any assets acquired through inheritance, annuity statements, documents reflecting the receipt of income from the repayment of a loan, and documents tending to show the possession of a cash hoard, to include loan applications, balance sheets, personal budgets, and financial organizers;

28. Items evidencing the expenditure of income to include, escrow files, vehicle/vessel purchase contracts, bank statements, checks, receipts, paid invoices, check registers and checkbooks, insurance documents, wire transfer records, stored-value debit cards, documentation reflecting conversion/possession/distribution of electronic currency, loan payments, debt obligations, mortgage statements, product service contracts, shipping labels, packing slips, and installment agreements; and

29. Personal calendars, diaries, address and/or telephone books and listings, rolodex style indices and papers reflecting names, addresses, telephone numbers, cellular phone numbers, fax numbers, telephone bills, correspondence by the known subjects of the investigation with associates, sources of narcotics supplies, sources of illegal weapons parts suppliers, sources of illegal weapons fabrication operators, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| | ) |
| The person Vin GAINES SR | ) |
| | ) |
| | ) |

Case No.    2:20-sw-0986 JDP

## SEALED

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

**The Person Vin Gaines SR.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____November 4, 2020_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern District of California.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for ___30___ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    _____October 21, 2020 @ 9:34 a.m._____

UNITED STATES MAGISTRATE JUDGE

City and state:       _____Sacramento, California_____       Jeremy D. Peterson, U.S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____        _____
              Signature of Judge                                    Date

# Attachment B
## Items to be Seized

Law enforcement is authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"):

- 18 U.S.C. §§ 371 and 922(a)(1)(A) – Conspiracy to deal firearms without a license;

- 18 U.S.C. § 922(a)(1)(A) – Dealing Firearms without a License;

- 26 U.S.C. § 5861(d) – Possession of Unregistered Firearms;

- 26 U.S.C. § 5861(e) – Transfer of Firearms in Violation of National Firearm Act;

- 18 U.S.C. § 922(g) – Felon in Possession of a Firearm;

- 21 U.S.C. §§ 841(a)(1) and 846 – Conspiracy to distribute and possess with intent to distribute methamphetamine; and

- 21 U.S.C. § 841(a)(1) – Distribution and possession with intent to distribute methamphetamine.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1.   Controlled substances, including methamphetamine, or items used to distribute controlled substances; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

2.   United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase heroin and counterfeit oxycodone pills during this investigation;

3.   Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4.   Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1);

5.      Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

6.      Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7.      Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including traveler's checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.      Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9.      Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.     Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person;

11.     Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records;

12.     Any firearm that does not have a lawful manufacturer stamp and serial number, any unregistered firearm (where registration is required by Title 26 of the United States Code), and unfinished lower receivers of any kind (including AR style unfinished lower receivers);

13.     Any items pertaining to the possession, manufacture, or distribution of illegal firearms, including but not limited to, lower receivers, upper receivers, grips, stocks, magazines, trigger assemblies, and barrels (including for AR-style firearms);

14.     Any tools and/or equipment associated with the manufacture of firearms, including but not limited to drills, drill presses, lathes, molds, molding equipment, welding equipment, jigs, hack saws, power saws, templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms;

15.     Photographs developed and undeveloped and/or videotapes or DVDs/CDs of firearms, firearm transactions, firearm parts, large sums of money and/or co-conspirators and

paperwork showing the purchase, storage, disposition, or dominion and control over any firearms, firearm parts, ammunition, or any of the items described in Attachment B;

16. Records relating to the acquisition and distribution and repair of firearms, firearms parts, tools and/or equipment associated with the manufacture of machineguns, short barreled rifles and/or other firearms, including but not limited to ATF Forms 4473, California Dealer Of Record Sale (DROS) records, books, receipts, invoices, notes, ledgers, and pay/owe sheets. The records should also include, but not be limited to, bank records, vendor lists, mailings, and purchase invoices/receipts;

17. Personal telephone books, telephone records, telephone bills, address books, correspondence, notes, and papers containing names and/or telephone numbers that tends to establish communication between co-conspirators;

18. Digital evidence of items described in Attachment B;

19. Evidence and records relating to the accumulation of proceeds derived from illegal firearms trafficking and manufacturing including, but not limited to, money order receipts, money transfer documents, bank records, and sales invoices/receipts;

20. Rental or lease agreements for storage units, safety deposit boxes, other storage locations, keys, combinations, and/or access codes for them;

21. Indicia of occupancy, residency, and/or ownership of the items noted above and of the premises, including but not limited to, papers, correspondence, canceled envelopes, canceled postcards, bills, and registration documents;

22. Any safes, locked cabinets, and/or other secured containers and/or devices at the location and in/on the vehicle identified in Attachments A-1 and A-2. Law enforcement shall be permitted to open such locked containers by force or through the use of a locksmith if necessary;

23.  Any machines and/or parts/tools associated with the use and/or association of the manufacturing and/or modifying of firearms, firearm parts, AR style unfinished lower receivers (and firearm unfinished lower receivers of any kind) machineguns and/or machinegun parts including but not limited to templates, cutting programs, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms;

24. Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to deal and/or manufacture firearms without a license, in violation of 18 U.S.C. §§ 371 and 922(a)(1)(A);

25. The contents of any surveillance camera or surveillance system used at the location identified in Attachment A-1;

26.     United States and/or foreign currency in excess of $2,000.00.  Items in excess of $2,000.00 in value tending to establish the expenditure of substantial income from illegal weapons trafficking, to include money orders, cashier's checks, certified checks, gold, silver, jewels, negotiable securities, certificates of deposit, documents depicting expenditures of cash;

27.     Items evidencing the receipt of income from any source including Forms W-2, and 1099, Federal and State income tax records and work papers, employment records, pay stubs, social security statements, business receipts, business books and records, journal and ledgers reflecting receipts, receipts, invoices, records from sales of assets, real estate sale and purchase records, escrow records, bank records (including foreign accounts and related transactions), brokerage records, investment account statements, receipts documenting purchase and sale of stocks, contracts, purchase orders, estate records, loan records, letters of credit, notes receivable, IOU's and other recordation of debts comprising evidence of loans receivable, documents reflecting insurance settlements, documents reflecting receipt of any assets acquired through inheritance, annuity statements, documents reflecting the receipt of income from the repayment of a loan, and documents tending to show the possession of a cash hoard, to include loan applications, balance sheets, personal budgets, and financial organizers;

28.     Items evidencing the expenditure of income to include, escrow files, vehicle/vessel purchase contracts, bank statements, checks, receipts, paid invoices, check registers and checkbooks, insurance documents, wire transfer records, stored-value debit cards, documentation reflecting conversion/possession/distribution of electronic currency, loan payments, debt obligations, mortgage statements, product service contracts, shipping labels, packing slips, and installment agreements; and

29.     Personal calendars, diaries, address and/or telephone books and listings, rolodex style indices and papers reflecting names, addresses, telephone numbers, cellular phone numbers, fax numbers, telephone bills, correspondence by the known subjects of the investigation with associates, sources of narcotics supplies, sources of illegal weapons parts suppliers, sources of illegal weapons fabrication operators, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists.